# RICHARDSON CO. et al. v. RUBEROID CO.

Circuit Court of Appeals, Second Circuit.
January 7, 1929.

No. 191.

George Ramsey, of New York City (L. F. Dittenhoefer and Drury W. Cooper, both of New York City, of counsel), for appellant.

Fish, Richardson & Neave, of Boston, Mass. (Harrison F. Lyman, of Boston, Mass., of counsel), for appellees.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge (after stating the facts as above). ▉ Comstock's disclosure is clearly the nearest to the patent in suit, but it is to be observed that it speaks of metal strips, and that it was concerned with single or twin shingles. Only in the passage quoted above is there any evidence of a purpose to use the shingles in continuous strips. Probably the intention was by those words to disclose such a strip, but it is clear that the patentee had not clearly considered the difficulties involved in so extending his invention. If single metal shingles were used, it is possible that compression by the longitudinal rib of the upper shingle upon the upturned edges or half ribs at the sides of two lower shingles might distort them into a passable joint. This would be more likely if the lower shingles were not set in absolute contact, and we need not say that the disclosure was inoperable to that extent. Also it may have been possible to use twin shingles, deforming or flattening the connecting rib of the lower pair by the longitudinal rib of the upper shingle, which covered it. This is more doubtful, but we can for argument assume that also. If, however, it were attempted to extend the shingles into a continuous strip, the deformation of the connecting ribs would be cumulative, and would after a short distance throw the whole strip out of registry.

It is plain that the suggestion—for it was no more—was of an impracticable invention and so the plaintiff proved. Nor do we think that it was an obvious change to leave out the reinforcing ribs. Electrical, etc., Co. v. Champion Switch Co., 23 F.(2d) 600, 604 (C. C. A. 2). To make the strips of flat metal was to depart from the instructions of the patentee, who supposed that such strips would not be serviceable. Perhaps he was wrong in this; but, certainly on a record which contains no such proof, we are not free to say that the mistake would have been immediately corrected. We think that the art got no practicable advantage from the disclosure.

Overbury struck close to the patent in suit, especially in his patent of 1908; all he had to do was to omit cutting his strip, shown in Figure 4 of that patent, into two strips and decrease its width. Still this very omission in all his patents is significant; it shows that he had not conceived the invention. In leaving one edge of his strip flat, he wasted a substantial part of that material which lay behind the teeth of the strip above it. This was not necessary to protect the roof, and was used by Heppes for the teeth of another strip.

Russell's shingles were separate, but, had that been all, we do not say, in view of Overbury's continuous strip, that they would not have sufficed as an anticipation, if their shape had been right. The defendant especially relies upon an alternative form, in which the square butts are tapered off on each side to produce an ornamental effect. But the material so cut away was lost; it formed no part of the teeth of another strip. Perhaps it might have done so, had Russell anticipated the defendant's form; but he did not. The lower edge, even of the modified form, was not a counterpart of the upper edge. While it is true that this is not expressly made a part of the claim, it is implied from the way in which the strips are produced, and the claim should be so limited. Russell does indeed say that his shingles save nearly 40 per cent. of the material necessary for shingles of "rectangular form," about the same saving that Heppes made over square butt strips. There is no evidence, however, that he was right, and in any case he is speaking of the difference in material between the area of a rectangular shingle and his own. Whether the saving in roofing is the same does not appear; the question is one on which we cannot speculate. At any rate, it is clear

that he contributed nothing more than Overbury, except that he reversed the exposed edge of his shingles.

Mankey's patent is plainly not relevant; it concerned quite a different art, with different demands and different means available. Clapboards are not flexible; the scalloped ends cannot be raised by the wind to admit rain. Besides, the boards were not staggered in laying, and the strips were not cut from continuous sheets. The patent in suit appears to us to be an advance over the art, and we are confirmed in our conclusion by the fact that it passed the Board of Examiners over references to Overbury and Russell, the nearest, except Comstock.

The objection, raised upon the appeal, that the claim was not sworn to, we shall consider, whether or not the appellant has strictly the right to raise it. We do not understand that it argues that, if the subject-matter appeared in the specifications, the claim needed a new oath. It was held in Heller Bros. Co. v. Crucible Steel Co., 297 F. 39 (C. C. A. 3), and Diamond, etc., Co. v. Bayer Co., 13 F. (2d) 337, 340 (C. C. A. 8), that any claim might be added which the specifications allowed, regardless of the nature of the original claims. We need not go so far, because the only difference between claim 1 originally sworn to and the claim allowed was in the introduction of the element that the strip should be of uniform thickness. Assuming that the specifications did imply a strip of uniform thickness, it would be absurd to say that the claim was not for the same invention as claim 1. Possibly the invention might have been broader than the specifications in this respect, if the claim had not been limited; but that would have been because the idea was capable of more generalized monopoly. The invention still was in the specifications, and a limitation to confine it to them did not introduce a new invention.

Thus the issue comes down to whether the specifications showed strips of uniform thickness. Expressly they do not; they only speak of strips cut from a "continuous sheet." Yet it is plain that such a sheet will ordinarily itself be of uniform thickness. Whether it is mechanically possible to weave one in alternating waves of thickness does not appear, and we do not know; but it would certainly be unusual, and we think it a far-fetched suggestion to suppose that the patentee had anything of the sort in mind. It is true that the lower edges of the strips might be reinforced, as in Overbury's patent, 875,099; but again that would be an addition not to be assumed, unless expressly mentioned. A "continuous sheet" seems to us to presuppose a web of uniform thickness, and, if the strips were to be reinforced, so vital an addition would not have been left to conjecture. We think that the specifications, read naturally, import strips of uniform thickness.

There remains only the question of infringement, which verbally turns upon the meaning of "apices." Strictly, the defendant has no exposed points; they have been substantially truncated, and the material cut off left in the valleys of the adjacent strip. Yet the change is scarcely more than one of taste; it could not, for example, be even plausibly argued that an infringer should escape because he had merely blunted the teeth or somewhat rounded them off. Change in degree may indeed become change in kind; but here we think it has not. Functionally the infringement is like the disclosure; the points of the upper strip protect the valleys of the lower; the upper and lower edges are counterparts; substantially as much material is saved; the ends are alike, and so are the means. The patent is scarcely a long step forward, but it does contain a genuine invention; to confine it so closely as the defendant requires appears to us to deny it any substance at all.

Decree affirmed.