LINDBLADH CORPORATION v. C. E. SHEPPARD CO.

No. 5950.

District Court, E. D. New York.
July 24, 1933.

Charles Neave, of New York City (Harrison F. Lyman, Charles E. Hammett, Jr., and Fish, Richardson & Neave, all of Boston, Mass., of counsel), for plaintiff.

Stephen J. Cox, of New York City (B. G. Foster and Henry L. Foster, both of Washington, D. C., of counsel), for defendant.

GALSTON, District Judge.

This is a patent infringement suit in which infringement is alleged of letters patent No. 1,813,940 for a ruling machine granted July 14, 1931, on an application filed on September 17, 1921, and of patent No. 1,609,648 for a ruling apparatus granted December 7, 1926, on an application filed August 3, 1923. The inventor of these devices is Harmon E. Lindbladh, plaintiff's assignor.

The inventions covered by these patents relate to improvements in duplex ruling machines, in which sheets, after having parallel

lines drawn, parallel to one another and to the edges of the sheets, are delivered to a second apparatus to produce intersecting lines upon the sheets.

The novelty of letters patent No. 1,813,940 is said to consist in the device which enables lines ruled by the second-acting apparatus to begin or terminate in definite controlled relation to the lines of the first-acting apparatus.

The specification is very detailed. Two ruling machines are arranged in the form of an L, having their frames extending substantially at right angles to each other and joined by an intermediate mechanism referred to as the transferring mechanism. This mechanism is so organized as to receive the sheets ruled by the first-acting apparatus and to deliver them to the second-acting apparatus, so that they are thereby provided on the same side with lines intersecting those produced by the first apparatus. Feed rolls journaled upon the frame of the first apparatus form a part of the sheet-advancing system by which the sheets are carried to pens or other ruling devices, movably mounted and governed through levers from actuating cams. The time of delivery of the sheets to the ruling devices is controlled by an oscillatory gate member and a cam. Cams governing the pens and gates are carried upon a shaft journaled transversely of the frame and are driven through change-speed gearing from one of the rolls rotated by a motor mounted upon the frame. An endless conveyor or cloth operates at its forward extremity upon a roll rotatable in bearings at opposite sides of the lower portion of the frame. This conveyor delivers sheets to a second endless conveyor.

As the sheets travel forward, they are received by the transferring devices. The devices of the transferring mechanism are driven at a constant speed through equal ratio gearing from the cam shaft of the first machine. The specification says:

"As a result of this connection, the pen and gate-controlling cams of apparatus A and the transferring devices 50 operate in never-changing synchronism."

The second machine is provided with the same sort of apparatus as the first. There is a cam shaft which carries the cams that govern the operation of the gate and which also govern the operation of the pens which are set down on the sheet in the second machine. The specification describing the second apparatus sets forth:

"This apparatus, like that already briefly described, has mounted upon its frame 146 feed-rolls 148, over the lower of which operates a cloth 150, which is a portion of the conveying system. Its movable ruling devices or pens 152 and its gate 154 (Fig. 1) are controlled by cams 156 and 158, respectively, upon a shaft 160 arranged in a similar position to that in apparatus A. Levers 159 actuate the pens in accordance with the contour of the cams 156. A definite time relation is maintained between this cam-shaft and the shaft 54 of the transferring mechanism by constant-speed gearing 162, which may be of the sprocket type, directly connecting said shafts. The consequence of this is that the transferring devices 50 and the cam-shaft 160 operate synchronously, so there is also synchronism existing between the cam-shafts of the two ruling apparatus, since, as already pointed out, the transferring shaft 54 is rotated in definite and unvarying time-relation with the cam-shaft 24. * * * To allow the rate of advance of the conveying system of apparatus B to be altered to provide for the operation of the ruling devices upon sheets of different dimensions, there is interposed between this shaft 172 and the shaft of the lower roll 148 change-speed gearing 174."

This patent has been referred to throughout the trial as the synchronizing drive patent; and it is contended that for the first time in the art a system of driving connections between the two halves of an L ruling machine makes double striking practicable. that is, striking in two directions, horizontal and vertical, on the same side of a sheet of paper at one operation and with one feeding of the sheets.

As known in the art, the term "striking" refers to ruling lines so that the lines begin and end at predetermined points on the sheet. "Feint-lining" means the ruling of lines which extend continuously from one end of the sheet to the other.

Claims 6, 8, 10, 32, 40, 44, 47, and 81 of this patent are in issue.

The alleged infringing device is one used by this defendant, having been purchased from, and manufactured by, W. O. Hickok Manufacturing Company. It may be noted that the manufacturer has controlled the defense of this suit.

Invalidity of the patent arising from want of invention and alleged inoperativeness and lack of novelty is the defense urged. It is also contended that the claims of the patent are obscure and vague and that they do not comply with the patent statutes.

A very clear and concise statement of the

structure and operation of these ruling machines led the defendant's expert, Boyle, to say that five major instrumentalities are involved in machines of this kind:

"There is the speed of the first cloth roller, the speed of the second cloth roller, the rotation of the first cam-shaft, the rotation of the second cam-shaft, and the operation in proper timed relationship of the transfer dog. And so the question is, how will these different instrumentalities be hooked up so that they will operate with precision, because these ruling machines are precision instruments. The pen-beam must strike on a certain definite line, and if it either overstrikes or understrikes one might say a hair's breadth, it affects the accuracy of the machine, and hence the appearance of the lined product."

These five instrumentalities are disclosed in the Lindbladh patent. The two cam shafts operate in synchronism as do the gates and pen beams which they control, as well as the transfer shaft. Each shaft revolves once for each revolution of each of the other shafts. The two cloth rolls rotate in predetermined relationship with each other and with the cam shafts. Provision is made for varying the speeds of the two cloth rolls with suitable changes in the change-speed gears. All of this is sufficiently set forth in the quotations heretofore made from the specification, patent in suit, page 2, lines 67–70, page 2, lines 77–85, page 4, lines 82–104, page 4, lines 113–119, and, in addition, page 6, line 49, and page 7, line 5.

In considering the attack made upon the patent, it will be helpful first to discuss the prior uses.

### The Knapp Machine of the George D. Barnard Company.

The construction of this machine was described by the witness Klippel, a paper ruler by trade, employed over fifty years by the George D. Barnard Company:

"First, it was constructed with two shafts on the off side of the ruler, with two long drives to the end of the machine. One was worked from the cloth roller and the cloth roller, that is, the lower one, it drove the one machine by belt drive. The second one was drove by the cam-shaft through the transfer point, up the incline to the second machine."

As originally constructed, it was possible to "strike" on the first Knapp machine, but not on the second. He was referring to a machine operated by the Barnard Company some time in 1890; then, prior to the spring of 1895, according to Klippel:

"We eliminated a lot of these cones, and so forth (witness refers to patent to Knapp No. 430,583 dated June 17th, 1890) because we found out we could go direct, you understand, we could put a shaft on there from cam-head to cam-head to strike on both machines."

That alteration of the machine, to enable striking on both halves on one feeding of the sheets, was effected about thirty-two years ago. The machine was then on the floor of the shop of the George Barnard Company in St. Louis. This witness said that the machine could be adjusted to run different sizes of sheets:

"Well, the size of the sheet controlled what we were going to do. If we had a sheet 17 by 28, which is a standard size, and we put in on the 17 inch way on the first machine, we would get our pattern reduced and then get it down to the transfer point, and set our dogs as Mr. Knapp called them in time, and then we run it up the incline on the tape rollers, up to the gate. Them gates were a trip hammer cam or an eccentric wheel, and we regulated that so it would just catch the sheets so as to stop in long enough for a given part to strike on an accurate point or a specified point."

The transfer device was operated from the main or cam shaft. To change the speed of the cloth on the second machine, a cluster of cones was used. The shaft which ran from the first cam shaft to the second cam shaft drove these speed gears.

This Knapp machine was operated over a period of many years. Its design was sought to be reproduced in a blueprint made by Mr. Broadmeyer, the engineer of the Hickok Company, and also in a model offered in evidence as Defendant's Exhibit H. The machine itself was destroyed some time between 1923 and 1924, but some parts of it were offered in evidence, Exhibits A-4, A-5, A-6, and A-11.

This Barnard machine was made up of two Hickok machines put together. It appeared that though Knapp had applied for a patent for the original machine, and though it is contended that he accomplished striking on both machines in one feeding of a sheet, he did not, so far as any testimony shows, apply for a patent to cover the asserted development of the machine.

But, aside from the testimony, the only physical exhibits in support of this alleged

prior use by the Barnard Company consist of certain sheets of paper alleged by Klippel to have been ruled upon it, a cloth roll, a transfer dog, one set of change-speed gears, one pen beam arm, and three shafts. These are not very convincing exhibits. Certainly, the sheets are not, because they could have been ruled on separate single striking machines; and of themselves they, of course, would not justify the inference that they had been made upon a double striking machine. So, too, from the parts produced, one cannot be persuaded that they must have come from a double striking machine.

Only one set of change-speed gears was offered. Pressed in close cross-examination, Broadmeyer admitted that the gears were not on the shafts when he found them in the Barnard plant.

Another significant exhibit is Defendant's Exhibit A-13, disclosing the general layout of the Barnard plant as of 1914. This shows the L machine with two drives from a line shaft in the aisle, the drive to the first half of the machine, and another to the second half. This latter was a separate belt drive. Some significance must be given to its omission on the drawings which Broadmeyer prepared of the Knapp machine under Klippel's guidance.

Now if the Barnard machine is to be considered as an anticipation, the proof should be convincing that the second machine was driven from the first half of the machine through connections between the cam shaft of the first machine and the cam shaft of the second machine and change-speed gearing between the cam shaft of the second machine and the cloth roll of the second machine, and not by a separate belt drive, as indicated in Defendant's Exhibit A-13. Certainly, both drives could not be used at the same time. Of course, it may be contended that the machine as originally built had a separate belt drive, and that, when the new driving connections were installed, the old drive, though no longer necessary, happened not to be removed. Such an explanation does not quite fit in with the testimony given by Klippel:

"XQ209. You did take out the cone pulleys and substitute another form of drive to the second half of the machine direct from the outside source of power? A. Yes, they were very cumbersome, them cone pulleys were.

"XQ210. When was that change made, substituting for the cone pulleys the drive to the second half of the machine from the line shaft down through the whole of the building? A. October, 1895"

—for that change was subsequent to the alleged installation of the drive from cam shaft to cam shaft, which Klippel said took place in the spring of 1895. There is some argument raised that, even so, the belt drive was used when it was desired only to feint line on the second half of the machine; but Broadmeyer, when sorely pressed in cross-examination, admitted that, unless the machine was run practically all the time for feint lining on the second half, the belt drive from the outside to the second half of the machine would not have been employed.

Added to the infirmities heretofore referred to, there is not sufficient corroboration of Klippel. Klippel, referring to the defendant's model and drawings, testified that there was a connection from the cam shaft of the first machine to the cam shaft of the second machine; whereas in the deposition given by Lambur, also a paper ruler, at one time employed by the George D. Barnard Company, he did not testify so, nor did Ehrmann, another paper ruler employed by the same company.

Clearly, then, the proof in respect to the construction and operation of the Knapp machine fails to meet the test as to establishing prior uses beyond a reasonable doubt. Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed Wire Co., 143 U. S. 275, 12 S. Ct. 443, 450, 36 L. Ed. 154; Deering v. Winona Harvester Works, 155 U. S. 286, 15 S. Ct. 118, 39 L. Ed. 153; Eibel Co. v. Paper Co., 261 U. S. 45, 43 S. Ct. 322, 67 L. Ed. 523; Block v. Nathan Anklet Support Co., Inc. (C. C. A.) 9 F.(2d) 311.

## The High Art Machine.

This was a machine installed at the plant of the High Art Ruling & Binding Company, also in St. Louis, some time in 1918. The testimony was taken concerning this machine in the public use proceedings which were instituted in the interference declared between the Lindbladh application for letters patent 1,813,940 and the application to Broadmeyer. Testimony was taken in March, 1927, and in May, 1927; and the Law Examiner of the Patent Office held that the alleged public use had not been established. Broadmeyer filed a petition to reopen the public use proceedings for the purpose of taking additional testimony of Fred Hoffman and Elizabeth Hoffman. The petition was denied by the Acting Commissioner of Patents on February 9, 1929, on the ground, as shown by their affidavits, that their testimony would not have changed the decision. An appeal was taken to the United States Court of Customs and Patent Appeals, which court affirmed the de-

450

cisions of the Patent Office. Broadmeyer v. Lindbladh, 47 F.(2d) 381, 382. Strictly speaking, that was an appeal in the interference proceeding from the decision of the Board of Appeals affirming the decision of the Examiner of Interferences awarding priority of invention to the plaintiff herein. But the decision is not without interest so far as the High Art machine is concerned, for the court said:

"The evidence submitted by appellant to establish that he conceived the invention prior to appellee's filing date, September 17, 1921, is not very satisfactory. Appellant filed an amended preliminary statement alleging that he reduced the invention to practice in 1918 by the construction of a machine embodying the invention for the High Art Ruling Company, of St. Louis, Mo. *On his direct examination he testified that this statement was incorrect and that the machine referred to did not embody the invention.*"[1]

Now the invention referred to is that defined in the counts of the interference. Count 1 is claim 6 of the patent in suit and reads as follows:

"6. In a duplex ruling machine, a plurality of ruling devices arranged to produce intersecting lines, means for moving a ruling device into and out of contact with the work at points definitely located with respect to an intersecting line produced by a previously-acting ruling device, means for presenting the work to the ruling devices, and means arranged to vary the rate at which the work is acted upon by the ruling devices."

Thus there would seem to be an admission by Broadmeyer that the High Art ruling machine does not embody the invention. The evidence adduced at this trial leads to the same conclusion.

The original machine was erected in August or the fall of 1917 by Robert J. Thompson, employed by the W. O. Hickok Manufacturing Company. It was an L machine, equipped to strike on the first half and to feint line on the second half. As originally erected, it would not strike on the second half of the machine, for it was not equipped with gates or beams.

A few months later he again visited the plant of the High Art Company, took the gear box off, and substituted a gear speed reducing mechanism. Later he again visited the plant and saw the machine in April, 1918, and he was asked "to put a strike" in the second machine. He said they added then "the gate and beams and cam heads and shafts and necessary gears and gates to strike on the second half." These parts they obtained from another striking machine, a single machine of the same size. This adjustment was not successful because of the slippage of the belts or other parts that "would throw the gates out of time." It was thereafter decided to drive from the cam shaft of one machine to the cam shaft of the other, and this was effected by extending the cam shaft out of the first machine and a gear placed thereon, from which gear they drove into another gear with a sprocket on, "and we drove down to the corner where there was another sprocket and two bevel gears, and a sprocket that went right up at right angles to the second machine. That was fastened on the other cam-shaft."

With the exception of an entry made in the books of the mechanic who made the changes, the proof with respect to the alterations in this machine is entirely oral. Certainly, as the quoted passages from Thompson's testimony indicate, no clear picture of the modifications is presented; and the entry is not a sufficient corroboration. Nothing is said therein concerning change-speed gears. Perhaps they were installed by this mechanic and covered by his entry of May 31, 1918, in the general phrase of the entry; but the proof is not adequate.

The plaintiff argues, and I think with conviction, that, if change-speed gears had not been added to the machine between the second cloth roll and the second cam shaft, then the second cloth roll must have continued to be driven by the belt and tapered cone pulleys, as was the condition when the machine was originally installed. The photographs of the machine taken by Thompson in 1926 and 1927 of course do not prove that the gears had been installed in May, 1918.

Moreover, the form of transferring device used in the High Art machine was changed in 1924 or 1925, and the old transfer mechanism taken out. Thompson was asked:

"XQ230. Then when the new suction corner was put in there you had a transfer mechanism that was timed to operate in time to the first cam-shaft? A. Yes, timed to the first cam-shaft.

"XQ231. Before that you did not? A. No, it was continually running. When the sheet arrived, it immediately went out."

Since a transfer device in one of these ruling machines is designed to pick up the sheet on its arrival at the end of the first ma-

---

[1] Italics mine.

chine for transfer to the second, such transfer mechanism must be adapted to effect the transfer whenever the sheet arrives at the end of the first machine. It is thus doubtful whether the High Art machine at any time prior to 1924 was designed to enable the transfer mechanism to operate in synchronism with the operation of the first machine in preparation for the delivery to the second machine.

On the whole, though, it is not at all clear that the machine as modified in 1918 was practicable as a double striking machine.

The testimony of Bleines, the proprietor of the High Art Ruling & Binding Company, is at least inconsistent, compared with the testimony of Thompson and others who described that machine:

"Q41. Was there a striking pen beam when you first bought it? A. Only on the first machine.

"Q42. How were you able, then, to strike on the second machine, after you put in this chain drive from the first cam shaft to the corner, and then to the second cam shaft? A. Well, we had seven, eight machines around and just used them. For feint line we took a striker off the machine and put on the second half of the L machine.

"Q43. And that striker consisted of what? A. Two beams—two strikers.

"Q44. And was there any gate put on the second machine? A. The gate was in conjunction with what we had taken off the other machine—just transferred them back from the other machine.

"Q45. Now when you were running the cam shaft of the second machine, from the cam shaft of the first machine, what ran the cloth roller of the second machine; that is, when you were running the cam shaft of the second machine by the chain gear? A. That was run off a chain from the first machine—off the front cloth roller. From the front cloth roller down—that was a separate drive—that continues all the time.

"Q46. Where was it? A. In the back end of the machine.

"Q47. There was a chain back there? A. Sure."

The foregoing testimony certainly is not in corroboration with Thompson in respect to the use of change-speed gears.

Whether the High Art machine, considered as a double striking mechanism, is anything other than an abandoned experiment, may well be doubted. Bleines admitted having a lot of trouble at the transfer end of the first machine.

"XQ129. I believe you testified that you had trouble with the cone drive in the corner, did you? A. Yes, sir.

"XQ130. And was that why you put in the suction corner? A. That was the cause of it, the reason—it would not work. It was not positive enough.

"XQ131. The cones would not work? A. No, they wouldn't pull."

There is no satisfactory evidence in the case that prior to 1924, when the trouble with the transferring mechanism was corrected on the High Art machine, it was ever successfully used as a double striking machine. Certainly what was done in the way of experiment prior to 1924 was not in anticipation of Lindbladh. Winget Kickernick Co. v. Kenilworth Mfg. Co. (C. C. A.) 11 F.(2d) 1; Keystone Manufacturing Co. v. Adams, 151 U. S. 139, 14 S. Ct. 295, 38 L. Ed. 103.

The patented prior art must next be considered.

Of the patents considered by defendant's expert, it may be said that no one in itself discloses the combination of the patent in suit. The closest approximation in the opinion of the defendant's expert is the British patent to Carr, No. 12,690 of 1915. To make this patent an anticipation, Mr. Boyle was compelled to read into it that which does not appear to be disclosed on its face. Mr. Boyle said:

"Now, that drive is not shown, but if you accept the fundamental principle in the operation of these L machines, that the camshafts to the two machines must operate in unison, if they are going to strike on both halves, why, the only conclusion we have to adopt here is that these two cam-shafts are operating in unison. If they did not operate in unison, the machine would not be operative—not for striking on the second half."

The object of the invention, as stated in the Carr patent, which appears to be merely for the side of a machine, is to provide simple and efficient means for ruling lines at right angles to each other upon paper in one operation. The difficulty with this patent is that it does not on its face show with sufficient definiteness that the machine is one capable of double striking. Under well-known rules in respect to foreign patents as anticipations, too much has to be supplied to make it effective:

"The lay-boy (not shown) which is ordinarily disposed at the delivery end of the

452

ruling machine is removed and disposed at the delivery end of the extension frame 2."

Also: "The ruling mechanism and parts of the machine not shown do not come within the scope of the invention and can be of any ordinary and well-known construction." Seymour v. Osborne, 11 Wall. 516, 20 L. Ed. 33; Carson v. American Smelting & Refining Co. (C. C. A.) 4 F.(2d) 463.

*United States Patent to Panter, No. 951,-696.*—This is for a printing and ruling machine comprising a feed table, printing cylinders, ruling disks mounted adjacent to the feed table, a receiving or adjusting table, a slidable stop and an adjusting stop extending through the opposite end, ruling disks mounted below the table, and means for conveying the paper from the table to the ruling disks.

I cannot see the pertinency of this patent to the claims in suit; and indeed Mr. Boyle failed to point out any bearing that this patent had as an anticipating reference.

The same comment may be made with respect to the British patent to Panter, No. 8,119 of 1907, which is similar to the United States patent to Panter.

*United States Patent to McAdams, No. 10,492.*—This patent was issued February 7, 1854, and apparently was cited to show an early arrangement of two machines at right angles to each other. The paper is fed into the first machine, and is carried on tapes to a transfer table having revolving rollers above it. Below the revolving rollers is a tape which runs on a pulley connected with a grooved roller on the second machine. The specification states:

"As the paper is moving in a direction at right angles to its first course, it will be seen that the pens v v will rule the cross-lines on the under side of the paper at right angles to those first ruled. The sheet then passes, as shown by the arrows in the drawings, around the roll w, when the cross-lines on the upper side will be ruled by the pens x x."

It is thus seen that, when the paper goes through the machine, it rules on both sides of the sheet. If, however, instead of feint lining on both sides, the patentee wants to strike, he attaches to the machine a device shown in Fig. 2. The operation of this device is not clear. Indeed, Mr. Boyle found some difficulty with it, and said:

"He does not specifically state whether he uses it on the first half alone or whether he uses it on both halves, but I reach the conclusion that in view of the fact that the ruling mechanism on the second machine is

an exact duplicate of the one on the first machine, and since the striking mechanism is caused by the movement of the sheet as it hits the cam roll, that this cam roll could be placed either on the first or on the second machine for the purpose of striking on both of them."

There is nothing in the specification to show that the patentee intended to strike in the horizontal direction. With no details as to a synchronization of the operating parts, it cannot be read upon the claims in suit.

*United States Patent to Knapp, No. 430,-583.*—By means of the machine described in this patent, the inventor sought to rule a sheet of paper horizontally and vertically at a single operation. The patent is of interest because the inventor was associated with the Barnard Company of St. Louis. A belt and tapered pulley system connect the two halves of the machine, and such a drive would seem to preclude the possibility of striking on the second half of the machine. So much was admitted by defendant's witnesses Thompson and Hickok. Nor is there a disclosure in this patent of connection of the cam shaft of the first machine to the cam shaft of the second machine. It does show a timed transfer device, but that is not enough to meet the claims.

*German Patent to Feuchtwanger, No. 121,328.*—The object of this invention was to secure ruling in two directions in one operation without making it necessary to remove the paper from the machine. The specification states:

"Each of the two single ruling devices can at will be provided in the known way with devices for producing interrupted lines."

On its face the disclosure is insufficient. Foreign patents must set forth fully all necessary features of the patent sought to be avoided. The description and drawings must be so full and clear as to enable a person skilled in the art to practice the invention without making experiments, as in Hoddersen-Balling v. Lorenz (C. C. A.) 60 F.(2d) 709. The machine is of the disk type.

The other prior art patents discussed by Mr. Boyle relate more particularly to the branch drive patent in suit, and need not be discussed in connection with the synchronizing drive patent.

I must conclude, therefore, from the foregoing analysis of the prior art, that there is nothing therein to anticipate the claims in issue.

Passing now to the question of infringement: The defendant's machine is shown in Plaintiff's Exhibit 3. Though it is contended

that claims 8 and 10 are obscure and vague, noninfringement cannot seriously be urged. So far as all the other claims in issue are concerned, the description of the defendant's machine set forth in the stipulation, Plaintiff's Exhibit 3, embodies the combination defined in claims 6, 32, 40, 44, 47, and 81.

Comparing this device with claim 6 in suit, we find that it is a duplex ruling machine having a plurality of ruling devices arranged to produce intersecting lines, means for moving a ruling device into and out of contact with the work at points definitely located with respect to an intersecting line produced by a previously acting ruling device, and means to vary the rate at which the work is acted upon by the ruling devices.

The synchronism of operation of the various parts of the device is set forth specifically in claim 44, and is repeated in claims 47 and 81 in suit. It is not argued that this feature is not present in the defendant's machine.

The argument concerning the infirmity of claims 8 and 10 is persuasive. These two claims read as follows:

"8. In a ruling machine, a plurality of ruling devices arranged to act successively upon the work, a plurality of work-controlling means one co-operating with each ruling device, means for actuating the controlling means in predetermined time-relation to one another, and means arranged to vary separately the rate at which the work-controlling means act."

"10. In a ruling machine, a plurality of sets of ruling devices, means arranged to cause the sets of ruling devices to act successively upon the sheets to be ruled in definite time relation to one another, means for feeding the sheets to one set of ruling devices, means by which the ruled sheets are received and are fed to another set of ruling devices, sheet-controlling means associated with each feeding means and corresponding set of ruling devices, and means arranged to vary the rate of feed of the sheets to one of the sets of ruling devices independently of the feed to an associated set."

They must be considered in connection with the following expression in the specification:

"Both the conveyors which feed and the gates which arrest may, however, be considered as means for controlling the sheets." Patent specification page 6, line 111 et seq.

At the trial, plaintiff, in interpretation of that passage, asserted that its meaning was that either the conveyors which feed or the gates which arrest may be considered as means for controlling the sheets. On that understanding the defendant properly argues:

"Does the patentee mean then that a machine can be built without gates, and come within the terms of his patent, or if gates are employed, conveyor cloths are unnecessary and such a structure would come within the terms of his patent?"

These two claims do not specifically call for a striking mechanism. The driving mechanism between the two may be either gates or conveyors, but the phrase "means arranged to vary separately the rate at which the work controlling means act" causes some difficulty in interpretation, for in the patent the two cam shafts operate in unvarying synchronism with each other, and consequently the variable means prohibit the application of this element of the claim to the gates, as the "work controlling means" of the claim. The work controlling means in this combination must be then only the conveyor cloths. Such a machine is anticipated by the Hickok machine shown in catalogue No. 70 of 1914, or No. 74 of 1918.

I think, therefore, as thus interpreted, claim 8 must be held to be invalid; and the same reasoning leads to a similar holding as to claim 10.

We now proceed to a consideration of patent No. 1,609,648, referred to throughout the trial as the "branching drive" patent. This patent is an improvement on the earlier patent. Referring to the earlier machine, Lindbladh in this specification writes:

"While such an operation is entirely correct in theory, the long train of gearing between the power-source and the last ruling apparatus tends to introduce difficulties. There is a cumulative backlash in the multiple-gearing elements, which may cause difficulty in the timing of the apparatus, for which it is troublesome to make allowance, particularly as it is variable. Moreover, exact synchronism may further be interfered with by torsion in the successive shafting, this shafting being so situated that it cannot conveniently be made sufficiently rigid. It is an object of this invention to eliminate this lost motion from the various mechanisms, and to provide a system in which the synchronism shall, for all practical purposes, be perfect."

The improvement is described:

"Mounted to turn in bearings in the frame of apparatus A, is a horizontal shaft 40 connected to a source of power, as an electric motor 42, by transmission-gearing 44 governed by a shifting device 46. The purpose of

this gearing 44 is to change the rate of operation of the entire duplex machine so that it will act upon a greater or less number of sheets in a given time. Mounted to rotate in the frame of apparatus B and lying in the same horizontal plane as the shaft 40, to which it is joined by equal-ratio bevel-gearing 48, is a shaft 50. The shaft 40 is connected directly to the cam-shaft 20 of apparatus A by change-speed gearing 52, while shaft 50 has like connections to the camshaft of apparatus B through change-speed gearing 54. Both the shafts 40 and 50 carry no operating elements, acting to supply power only, and being so located upon the frame that the bearings may be ample and the shaft of any suitable size to resist torsion under the maximum load. Moreover, from this system of shafting, which is unvarying in action throughout because of the single bevel-gear connection at 48, motion is imparted to the two cam-shafts of the ruling apparatus A and B through short trains of inflexible gearing, wholly independent of each other, so there is none of the uncertainty of action produced by chain-drive and passing from one train of gearing to another. There results unvarying synchronism between the cam-shafts of the two apparatus, with ability to so set the actuating mechanism of the pens that those of the second apparatus B will strike precisely with reference to the lines produced by the apparatus A. The change-speed gearing 52 and 54 gives simple and effective means for maintaining this synchronism when changes are made for ruling sheets of different maximum dimensions. That is, assuming that cross-ruling, or that extending transversely of the sheets, is to be done upon the apparatus A, and down-ruling, or that lying longitudinally of the sheets, upon the apparatus B, if a sheet of a different length is to be operated upon, this will be provided for by a suitable shift in the gearing 54. Then, upon making the same change in the gearing 52, there will be a maintenance of synchronism, which permits accurate setting of the actuating mechanisms at the two apparatus to insure precision in the relation between the lines ruled by the two sets of pens."

Another pertinent part of the specification is the following:

"To synchronize the rotation of the shaft of sectors 26 with the cam-shafts, so such sectors will unfailingly deliver a sheet for each operation of the pens of apparatus B, it is effectively driven from the cam-shaft of apparatus A through bevel-gearing 60 acting upon a vertical shaft 62 rotatable in the frame of this apparatus, and which, in turn, communicates motion by bevel-gearing 64 to a horizontal shaft 66 extending longitudinally of this frame. Sprocket-gearing, 68, including a short chain, joins the shaft 66 to the sector-shaft."

Claims 1, 4, 5, and 6 are in issue. We may take claim 1 as a typical claim. It reads:

"1. In a ruling machine, a plurality of sets of movable ruling devices, actuating mechanism for each set of ruling devices, driving means, and positive continuously acting connections from the driving means to each actuating mechanism, each of said connections being individual to an actuating mechanism."

The defenses urged are prior invention on the part of Broadmeyer, anticipation as evidenced by prior art, concealment of patent, laches, and noninfringement.

The patent to Broadmeyer, No. 1,846,582, granted February 23, 1932, was on an application filed January 18, 1923. This patent relates to an improvement in ruling machines of the type under consideration herein, and it discloses, as defined in the claims and explained in the specification "means for transmitting motion from the primary driver directly to each of the machines, independently of the other, to actuate the respective machines," which is almost the language of the Lindbladh patent.

Broadmeyer had the earlier filing date, January 18, 1923, as against August 3, 1923 of Lindbladh. It is important thus to determine the matter of priority as between these two inventors.

Lindbladh testified that the first Lindbladh machine, embodying the synchronizing drive feature, was exhibited at the Graphic Arts Exposition in July, 1921, in Chicago. It had been sold prior to exhibition to the Gresham Blank Book Company of New York City. As a result of the exhibition, the plaintiff sold a similar machine to Redding and Hauser of Chicago. It may be noted that the W. O. Hickok Company was also an exhibitor at that Exposition and had a booth in the immediate vicinity of the Lindbladh Corporation's machine.

In the early machines there developed a slight variation on the striking of the second machine, and so Lindbladh conceived the idea of driving each machine individually with a branch drive.

The machine is of proved utility. Among others using it are the United States government, the Canadian government, and the printer of the British government.

The first machine bearing the branch driving feature made by Lindbladh was erected and in operation on March 25, 1922 at the plant of the H. E. Lindbladh Company in Boston. The work on the machine was begun in the fall of 1921 and finished in 1922 at Franklin, N. H., by the Lindbladh Corporation. These facts were testified to by Cloutier, an employee of the Lindbladh Corporation since 1916. Corroboration was given by Frederick H. Kelley, a foreman employed in the shop at Franklin, by Richard E. Kelley, a machinist, who also testified as to certain alterations made on the machine in April, 1922, and by Robert T. Duffy, treasurer of the Lindbladh Corporation, who produced a bill of sale dated November 26, 1921, before the machine was finished. Mr. Duffy testified that the shipment from Franklin to Boston was on March 8, 1922, and he also corroborates the other witnesses as to the modifications made in the drive on April 29, 1922.

I find then that there was a reduction to practice on April 29, 1922, and that the conception of the branch drive dates back to October, 1921, after Lindbladh saw the Gresham machine in New York. The disclosure was to Kelley on October 22, 1921.

This conception and the reduction to practice were prior to Broadmeyer's filing date. Broadmeyer attempted to prove reduction to practice as of February or March, 1922. At that time the Hickok Company sold its first double striking machine to the Schaeffer Company at St. Louis. Thompson and Broadmeyer testified that this machine corresponded to the device defined and disclosed in Broadmeyer's patent, No. 1,846,582. The proof in this respect is not convincing. The Schaeffer machine is still in existence. Thompson testified at the trial in contradiction of his own testimony given in the public use proceedings as to the drive in the Schaeffer machine. Lindbladh and Duffy inspected the machine in March, 1927, when they were in St. Louis in connection with the public use proceedings. The condition of the machine then was the same as when first installed. Their testimony is in flat contradiction to that of Thompson and Broadmeyer, and is to the effect that the second half of the machine was driven from the cam shaft to the first machine. There was not a branch drive.

Not only is the testimony of Lindbladh and Duffy more credible than that of Thompson and Broadmeyer, but there was a significant failure on the part of the defendant to offer any testimony by anybody connected with the Schaeffer Company. Not even a photograph of the machine was offered.

The plaintiff and the Hickok Company have been in patent controversy over a period of eight years. While the defendant was taking depositions in this cause in St. Louis in respect to the High Art machine and the Barnard machine, it could readily enough have included the Schaeffer machine. From its failure so to do, taken in conjunction with the other circumstances of the case, an unfavorable inference must be drawn.

There is thus a failure of proof to sustain the contention that the Schaeffer machine was a reduction to practice. Broadmeyer must, accordingly, be held to the date of the filing of his application for constructive reduction to practice. In respect to his conception, he claims as early a date as 1917. It need only be said in that connection that, if the proof of such conception were satisfactory, which it is not, there would be a failure of proof of due diligence of reduction to practice from that time to November, 1921.

Now as to the defense of common knowledge and prior art patents: Reference is made to United States patent to Labombarde and Sidebotham, No. 1,253,054. This is for an envelop machine, and is cited because a branch drive is employed in an L machine. The relation of this art to the ruling machine art is not appreciated. The problems of one are certainly not those of the other. There is some similarity of structure. Certainly it cannot be contended that without radical change could the Labombarde machine be used for the purposes of the ruling device art. At least there is no suggestion given in the interpretation of this patent which argues such a possibility.

Defendant cites Kil-Nock Co. v. Chicago Plating Co. et al. (D. C.) 10 F.(2d) 536, 538, in support of the well-understood rule that "a proper test of the validity of a patent is in the application of the rule that what would infringe, if later, is anticipation, if earlier." The answer is that there is no suggestion that the Labombarde machine infringes the claims of the patent in suit.

The Staude patent, No. 1,179,573, patented April 18, 1916, is a machine for envelop making, a field widely removed from the ruling device art. This patent was not discussed by the defendant's expert, as he selected an earlier patent to the same inventor, No. 1,144,506. This patent also relates to a machine for envelop making. The device shows a divided drive, but has no other significance.

United States patent No. 790,157 to Rose,

456

issued May 16, 1905, relates also to a non-analogous art—a machine for making collapsible boxes. It may be conceded that this likewise shows the use of a divided drive on an L machine.

Patent No. 604,530 to Hobbs, issued May 24, 1898, is for a machine for scoring cardboard. This too is a nonanalogous art.

Anticipation cannot be deduced from these patents. C. & A. Potts v. Creager, 155 U. S. 597, 15 S. Ct. 194, 39 L. Ed. 275; Electric Controller & Supply Co. v. Westinghouse Electric & Mfg. Co. (C. C. A.) 171 F. 83; Richardson Co. et al. v. Ruberoid Co. (C. C. A.) 30 F.(2d) 232.

In the discussion of Carr British patent, No. 12,690 of 1915, it is pointed out that the two parts of the machine are driven independently and that no striking could be done on the second machine if the two halves were driven independently from separate sources of power. The specification recites:

"The ruling mechanism on the frame 2 is driven independently of the ruling mechanism on frame 1, and the tapes on the rollers 25 and 39 are driven from the ruling mechanism on said frame 2."

This is not a sufficient disclosure of a branch drive, and, as Mr. Boyle admits, the drive is not shown.

The claims in suit are very broad, and it may well be that, had Carr disclosed the drive, which Mr. Boyle admits was not disclosed, these claims might have been imperiled.

It is contended that plaintiff was guilty of laches in that it withheld this patent application from interference and delayed suit on the patent for six years.

When the interference between Lindbladh's application for a synchronizing drive patent and the Broadmeyer application for patent No. 1,846,582 was instituted, Lindbladh's application for a branching drive patent, No. 1,609,648, was pending in the Office.

Rule 109 of the Rules of Practice of the Patent Office permits an applicant involved in an interference proceeding to file an amendment to his application to contain "any claims which in his opinion should be made the basis of interference between himself and any of the other parties." Lindbladh under that rule made a motion to add certain claims to the interference, however, from his application for the synchronizing drive patent, but did not include any of the claims of his application for the branch drive patent.

I do not see how this can be charged as laches. The rule is not mandatory, but permissive only. There was no obligation on Lindbladh's part to reveal the invention of his copending application.

As to the delay in bringing suit on this patent, which issued on December 7, 1926, before 1932, sufficient explanation is found in the protracted controversy between the plaintiff and the Hickok Company.

The interference between Lindbladh and Broadmeyer (a Hickok employee) was instituted in 1925. The Hickok Company then initiated, during the course of such interference proceedings, public use proceedings. A succession of appeals by the Hickok Company was taken; and the case was finally decided by the Court of Customs and Patent Appeals only in 1931, 47 F.(2d) 381.

The Hickok Company was the stronger company financially, and not only was the plaintiff company subjected to expensive litigation, but also to keen competition. All of this was convincingly described by Mr. Duffy, the treasurer of the plaintiff company:

"Q75. Why was this patent, this patent to Lindbladh, 1,609,648, which was issued in 1926, December, why the suit, the present suit, was not begun until last year? Why didn't you sue Hickok during the interval from 1926 to 1932? A. During the interval from 1926 to 1932—'31, we were involved in Patent Office litigation continuously during that time.

"Q76. With whom? A. With the Hickok Company. It was a terrible struggle for us. Our finances were practically wiped out. We were poor. We were struggling to get along. We just didn't know which way to turn. We were unable financially to engage counsel to begin another suit while we were still struggling with one for that long period."

In the light of this explanation, laches cannot reasonably be charged against the plaintiff.

As to the question of infringement, not much need be said. The defendant seeks to trace the development of its machine from the prior art and alleged prior uses; but, whatever the source of its knowledge, the fact remains that under the description in the stipulation it has manufactured machines embodying the combination set forth and defined in the claims in suit. And since the prior art hereinbefore considered does not yield an anticipation and discloses no lack of invention, infringement must be found.

If we take claim 1 of the branching drive

patent in suit as typical, the claim reading: "1. In a ruling machine, a plurality of sets of movable ruling devices, actuating mechanism for each set of ruling devices, driving means, and positive continuously acting connections from the driving means to each actuating mechanism, each of said connections being individual to an actuating mechanism"—we find the cam shafts which operate the gates and the pens of both parts of the machine. The defendant employs a motor and main drive shaft from which power is communicated separately to the two halves; and these constitute a driving means. The driving connections from the motor-driven stud shaft of the defendant's machine are separate, and the positive continuously acting connections from the driving means are present; so each element of the claim is found in the defendant's structure.

Plaintiff may have a decree in conformity with the foregoing opinion.